Filed 5/11/23  P. v. Elias CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>MICHAEL A. CRUZ ELIAS,<br><br>    Defendant and Appellant. | B319595<br><br>(Los Angeles County<br>Super. Ct. No. MA078183) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Robert G. Chu, Judge.  Affirmed.

Richard A. Levy, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Noah P. Hill and Thomas C. Hsieh, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Michael A. Cruz Elias[1] of the murder of Jose Ahumada. At trial, the killer's identity was in dispute. As to that issue, the trial court admitted evidence that Elias had participated in a shooting just weeks before Ahumada was killed and that bullets recovered from that shooting and the Ahumada shooting were fired from the same gun. On appeal, Elias contends that this evidence should have been excluded or limited. He also contends that the trial court made prejudicial comments during voir dire, should have instructed the jury on voluntary manslaughter, and should have dismissed a firearm enhancement under recently enacted law. We reject all contentions and affirm the judgment.

## BACKGROUND

I.     The prosecution's case

A.     *Wendy C.'s testimony*

At Elias's trial for Ahumada's murder, Wendy C. was the prosecution's main witness, and she testified under a grant of immunity. According to Wendy, she and Ahumada had met just a few months before March 2018 and would occasionally get together to drink and smoke marijuana. Although Ahumada wanted to be more than friends, Wendy refused. On the evening of March 5, 2018, Ahumada asked Wendy if she wanted to hang out. Wendy agreed but asked if her friend Elias could come with them, even though Elias and Ahumada had never met. Wendy had known Elias for about a year, and although she said they had

---

[1]     It is unclear if defendant's surname is Cruz Elias or Elias. We refer to defendant as Elias, intending no disrespect.

not been intimate, she also testified that they had been intimate "[o]nly a little bit."

Ahumada picked up Wendy and Elias in his car.[2] Wendy sat in the front passenger seat, and Elias sat in the backseat. After buying beer, they went to Ahumada's "connect's house" where he bought cocaine. Then they went to "the view," a place off of Pearblossom Highway in the mountains where they parked on a dirt road. Ahumada and Elias drank beer and snorted cocaine, and Wendy smoked marijuana.

They were all just sitting there quietly getting high and listening to music, when gunshots came from the backseat directed at Ahumada. In shock, Wendy saw blood everywhere. Ahumada was dead. At Elias's direction, Wendy helped him put Ahumada's body into the car's trunk. Elias then drove Wendy home. Wendy did not know what Elias did thereafter.

B.  *The investigation*

The next day, March 6, 2018, the police received a report that a car had been abandoned at a location in North Hollywood that was two blocks from where Elias lived. Law enforcement recovered the car, which belonged to Ahumada. Five 9-millimeter bullets and Ahumada's cell phone with the SIM card removed were recovered from the car. Subsequent testing found

---

[2]     Wendy testified that Ahumada picked her and Elias up from her home. But Wendy had been reported missing since February 27, 2018, and she did not return home until two days after Ahumada was murdered.

Elias's DNA on the steering wheel and interior rear driver's door.[3]

About seven months after Ahumada disappeared, his remains were discovered in a shallow grave in Lancaster near Highway 14. A medical examiner determined that he had suffered multiple gunshot wounds but could not determine the exact number of wounds. However, a sweatshirt and t-shirt recovered with the remains had five bullet holes in them.

After law enforcement posted a reward for information about Ahumada, a tip led them to Wendy. Detectives interviewed her three times. During the first interview in November 2018, Wendy initially said she and Ahumada went to the view alone a long time ago, and she denied knowing Elias. After the detective exhorted Wendy to tell the truth, Wendy began to cry and said Ahumada had tried to "force" himself on her. She also admitted she hung out with Elias "a lot." She then said a "white guy" high on cocaine was with her, Elias, and Ahumada that night at the view, the white guy and Ahumada argued, and the white guy shot Ahumada. She denied helping bury the body.

In her second interview with detectives in January 2019, Wendy at first maintained that the white guy killed Ahumada and denied that Elias was the shooter. The detectives then told Wendy that they knew there was no white guy, that Elias was the shooter, and that if she continued being dishonest then she could become an accessory to murder. Wendy then said Elias had killed Ahumada. She denied that anything happened just before Elias shot Ahumada, saying they were just doing drugs and

---

[3]     The defense argued that the DNA evidence was, at most, consistent with Elias being an accessory after the fact by helping to bury the body.

listening to music.  However, Ahumada had previously made advances at Wendy.  Also, her relationship with Elias was "kinda" romantic.  She didn't know if Ahumada did anything to make Elias jealous, although she agreed that Elias was the jealous type.  And when asked what led to the shooting and whether "it had something to do with this guy [Ahumada] having an interest in you," Wendy said, "Maybe that."

C.    *Prior shooting evidence*

Over a defense objection, the prosecution introduced evidence that Elias was involved in another shooting just weeks before Ahumada was murdered.  Sandra Quintanilla testified that on the evening of February 16, 2018, she was at a liquor store in Palmdale with two friends she identified as Listo and Kevin.  They had all been drinking.  While in the store, someone got into a physical altercation with the store's clerk.  Quintanilla, Listo, and Kevin left.  Hours later, they were walking when a car approached them with five people inside, including the store's clerk.  Hostile words were exchanged.  Quintanilla challenged them to a one-on-one fight, so she briefly went home to get a knife.  When she got back outside, someone from inside the car shot at them.  Quintanilla saw a person in the backseat chamber a round into a handgun and hand the gun to the driver, who shot the gun.

Not long after the shooting was reported to law enforcement, an officer stopped a car matching the description of the car involved in the shooting.  Four, not five, men, including Elias, were in the car.  No weapons were found.

Quintanilla identified Elias as the shooter from a photographic six-pack.  However, at trial, the parties stipulated that after the shooting, Quintanilla told an officer that the store

5

clerk drove the car, and after retrieving the knife, she heard gunshots fired in her direction but did not see from where they were fired.

### D. *Firearm expert testimony*

A firearm expert examined Ahumada's car and, based on tests using a rod to determine the trajectory of bullets, opined that the shots were fired from the backseat. The firearm expert also analyzed bullets recovered from the Quintanilla shooting and bullets recovered from Ahumada's car. He determined that they were fired from the same gun.[4]

## II. Defense evidence

A forensic psychologist testified that detectives coerced Wendy's statement implicating Elias. The expert said, "This was a very powerful session and focused on shifting Wendy from 'Mike had no involvement' to 'Mike was the shooter,' and succeeded in doing that."

## III. Verdict and sentence

Elias was charged with and a jury found him guilty of second degree murder with a personal gun use allegation (Pen. Code,[5] §§ 187, subd. (a), 12022.53, subd. (d)). On March 25, 2022, the trial court sentenced Elias to a total term of 40 years to life (15 years to life plus 25 years to life for the gun enhancement).

---

[4] We discuss the firearm expert's testimony in greater detail below.

[5] All further undesignated statutory references are to the Penal Code.

# DISCUSSION

## I.  Prior shooting evidence

Elias contends that evidence he was involved in another shooting in the weeks preceding Ahumada's murder should have been excluded and that its admission violated his federal and state constitutional rights.  As we now explain, we disagree.

### A.  *Additional background*

Before trial, Elias moved to exclude evidence of the prior February 2018 shooting involving Quintanilla on the grounds there was insufficient foundation, it was inadmissible under Evidence Code section 352, and admitting it would violate his state and federal constitutional rights.  As to foundation, defense counsel argued that Quintanilla saw a man in the car hand Elias a gun but did not see Elias fire a gun.  The prosecutor countered that it was expecting to use the evidence to negate self-defense or accident, but that it would also be admissible to establish identity, as bullets recovered from both crimes were fired from the same gun.  The trial court admitted the evidence, finding that Elias's possession of a gun, even though prejudicial, was "extremely probative" and not outweighed by the probability it would consume an undue amount of time, create a danger of undue prejudice, or confuse or mislead the jury.

### B.  *The trial court did not abuse its discretion by admitting the evidence*

Only relevant evidence is admissible.  (Evid. Code, § 350.)  Relevant evidence is "evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of

consequence to the determination of the action." (*Id.*, § 210.) Generally, evidence of prior criminal acts is inadmissible to show a defendant's disposition to commit such acts. (*Id.*, § 1101, subd. (a).) However, evidence that a person committed an uncharged crime may be admitted to prove something other than the defendant's character, such as motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake, as well as to attack or support the credibility of a witness. (*Id.*, § 1101, subds. (b), (c).) Even if evidence is admissible under Evidence Code section 1101, it may be excluded under Evidence Code section 352 if its probative value is substantially outweighed by the probability its admission will necessitate undue consumption of time or create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.

Although admitting evidence of a defendant's prior criminality could prejudice the defendant's case and render suspect the trial's outcome, whether to admit such evidence rests in the trial court's sound discretion. (*People v. Harris* (1994) 22 Cal.App.4th 1575, 1580–1581.)

Here, Elias first argues that the trial court failed to comply with its gatekeeping function to determine by a preponderance of the evidence the existence of the prior uncharged act and his connection to the act as preliminary factual issues. (Evid. Code, § 403, subd. (a); *People v. Winkler* (2020) 56 Cal.App.5th 1102, 1144.) Specifically, Elias argues that the trial court was required to find by a preponderance of the evidence that the gun *belonged to* him and that he would have continued to possess it three weeks later when Ahumada was killed. Elias thus asserts that all the proffer showed was he had constructive, as opposed to actual, possession of the gun.

8

We disagree the trial court had to find that Elias owned the gun before it could admit the evidence. Rather, the trial court had to find that Elias was *connected to* the prior shooting and the gun. (See *People v. Winkler*, *supra*, 56 Cal.4th at p. 1144.) The proffer of evidence before trial was that Quintanilla identified Elias as one of the car's occupants and saw someone hand him the gun. This was sufficient to show by a preponderance of the evidence that Elias was connected to the gun that, three weeks later, was used to kill Ahumada. That evidence was thereafter introduced at trial that Quintanilla gave different statements about who the driver was—she identified Elias as the driver and shooter from a photographic six-pack, but she told an officer soon after the incident that the store's clerk drove the car and she didn't see who fired the shots—went to the weight of the evidence and not its admissibility.

For these reasons, *People v. Smith* (1921) 55 Cal.App. 324, which Elias cites, is distinguishable. In that case, the People's theory was that the defendant murdered his wife by poisoning her with cyanide. The prosecutor admitted evidence that a can of cyanide was in the filing room of the truck company the defendant worked for, and defendant had been seen coming in and out of the room. (*Id.* at p. 331.) The court found that the evidence should have been excluded because there was no evidence connecting the defendant to the can of cyanide other than that it was in a room at his workplace and because there was no evidence the defendant knew of the can's existence. In contrast, the evidence here is that Elias was in a car with just three or four other people and that someone passed the gun to him. Thus, Elias knew about the gun and possessed it.

9

Elias next contends that even if the prior shooting was admissible under Evidence Code section 1101, it should have been excluded under Evidence Code section 352. His argument again rests on the notion that there was insufficient evidence he owned the gun and was the one who used it in the prior incident. As we have said, establishing ownership of the gun was unnecessary. Rather, the highly probative value of the evidence was that Elias was involved in a prior shooting with the gun later used to kill Ahumada. (See, e.g., *People v. Sanchez* (2019) 7 Cal.5th 14, 55–56 [evidence defendant had a gun shortly before at-issue murders properly admitted]; *People v. Carpenter* (1999) 21 Cal.4th 1016, 1052 [same].) The evidence therefore went to identity.

And even had Quintanilla not testified that Elias was the shooter, Elias's mere involvement in that prior shooting was a sufficient basis to admit the evidence because it still showed his connection to the gun, raising the reasonable inference he was able to access it three weeks later to kill Ahumada. Moreover, the evidence did not consume undue time, as it was limited to two witnesses (Quintanilla and an officer) and a stipulation. Nor was there a risk it would confuse or mislead the jury. Instead, the issue was simple: three weeks before Ahumada was shot, Elias had the gun used to shoot Ahumada.

For the same reasons, Elias's trial was not fundamentally unfair. (See generally *Estelle v. McGuire* (1991) 502 U.S. 62, 70; *People v. Partida* (2005) 37 Cal.4th 428, 439 [even incorrect evidentiary ruling denies a defendant due process of law only if it makes trial fundamentally unfair].)

10

II.     Firearm expert testimony

Relying on *People v. Azcona* (2020) 58 Cal.App.5th 504 (*Azcona*), Elias contends that the trial court erred by allowing the firearm expert to testify that the bullets from the Quintanilla and Ahumada shootings were fired from the same gun.

*Azcona, supra*, 58 Cal.App.5th at page 508, involved a series of shootings occurring over a one-month period. At the defendant's trial for those shootings, the prosecution's firearm expert testified that bullet casings recovered from two crime scenes were fired from the same gun " 'to the practical exclusion of all other guns.' " (*Id.* at p. 510.) The expert based his conclusion on his visual comparison of the casings. The defendant had objected to the expert's testimony, arguing that recent studies undermined the reliability of visually comparing toolmarks on bullet casings such that it was no longer admissible under *People v. Kelly* (1976) 17 Cal.3d 24, 32, which held that a scientific technique is admissible in California if it is generally accepted in the scientific community. The Court of Appeal found that even if *Kelly* applied to the toolmark examination at issue, the defendant, who relied heavily on three reports, two from the National Academy of Sciences, criticizing that technique, had not met his burden of showing that a clear majority of the scientific community no longer accepted the technique as reliable. (*Azcona*, at pp. 512–513; see also *People v. Cowan* (2010) 50 Cal.4th 401, 470 [ballistics comparisons and toolmark identification through the use of molds were not new techniques beyond common understanding and not subject to *Kelly*].) *Azcona*, at page 513, thus was "unable to say, on this record, that firearm toolmark comparison testimony is no longer admissible in California."

11

Nonetheless, *Azcona, supra,* 58 Cal.App.5th at page 513, went on to find that the trial court had failed in its gatekeeping function of ensuring that the expert's opinions were supported by material on which the expert relied. Where significant criticism of the expert's method has been presented, a trial court must "carefully determine what conclusions can reliably be drawn from the methodology in question." (*Ibid.*) By allowing "unfettered expert testimony that went far beyond what the underlying material supported"—that the matching marks on the casings were " 'much more than can ever happen by random chance,' and therefore the projectiles came from the same gun, 'to the practical exclusion of all other guns' "—the trial court abandoned its gatekeeping function because the expert's conclusion was supported merely by his broad reference to numerous studies on the subject to see what can happen by random chance. (*Id.* at pp. 513–514.)

Elias interprets *Azcona* as holding that visual comparisons of bullets or casings, although admissible, are insufficient to allow an expert to express a scientific certainty in the opinion. He therefore argues, as he did below, that the firearm expert could only testify that the bullets from the two crimes were *consistent with* having been fired from the same gun.

The first problem with this argument is that the firearm expert here did not testify that the bullets were fired from the same gun to any degree of scientific certainty. In contrast, the *Azcona* expert testified, " 'It would be in the billions to be wrong on this' " and " 'it is so certain that I don't think there's any reasonable chance that it's wrong.' " (*Azcona, supra,* 58 Cal.App.5th at p. 519 [conc. opn. of Greenwood, P.J.].) The firearm expert here made no similar statement and was not

12

asked to opine on any scientific certainty he had regarding his opinion.

The second problem is that we do not interpret *Azcona* as holding that visual toolmark comparisons are, as a matter of law, so scientifically suspect that wholesale limitations must be placed on firearm expert testimony *in all cases*. Rather, *Azcona* held there was insufficient foundation *in that case* for the expert's testimony that the casings were fired from the same gun with scientific certainty. The defense in *Azcona* had presented criticism of toolmark visual analysis in the form of three reports and an expert's testimony. Here, however, defense counsel did not present any reports, expert testimony, or other evidence criticizing the specific ballistics methodology. Defense counsel merely cited *Azcona*[6] to support her argument that the firearm expert was limited to saying the bullets appeared to be consistent with being fired from the same gun. Defense counsel otherwise did not respond to the prosecutor's proffer that his firearm expert's methodology differed from the "line counting method" the *Azcona* expert used; that is, the *Azcona* expert testified that his identification criteria required six individual marks in a row made by the firing pin. (*Azcona, supra*, 58 Cal.App.5th at p. 510.) The prosecutor here said his firearm expert instead used a "totality-of-the-circumstances" examination to reach his conclusion the bullets were fired from the same gun.[7] The

---

[6]     The concurrence in *Azcona* summarized the reports.

[7]     Defense counsel responded to the prosecutor's proffer by pointing out that "nobody has the entire universe of guns available at their disposal to be able to" state they were fired from the same gun, especially where, as here, the gun was never

firearm expert thereafter testified at trial that he examined the bullets' rifling characteristics, referring to the spiral grooves in a gun's barrel that "impart twist to the bullet" to give it accuracy. In this case, the bullets had polygonal rifling. The expert then referred to a database into which rifling characteristics are entered. From this, the expert narrowed down the bullets' possible manufacturers. Thus, while the *Azcona* expert and the firearm expert here both used a visual toolmark analysis, the firearm expert here examined rifling characteristics and not marks made by the firing pin.

The firearm expert also presented a basis for his conclusion that the bullets recovered from both shootings were fired from the same gun. He said that when a gun is manufactured, inherent microscopic details make a gun barrel unique so that when a bullet is fired from it, these details are imparted to the bullet. The firearm expert testified that in 100 years of traditional firearms identification, no one has seen two gun barrels, even from the same production line, exhibit the same individual characteristics. The expert had personally participated in national studies in which he was given 15 unknown fired bullets fired from 10 consecutively manufactured barrels off the same production line having the same operator, tool, speed rate, and metals, and he was able to match each bullet to the barrel from which it had been fired. Defense counsel did not cross-examine the expert about his bullet comparison testimony.

---

recovered. In response, the trial court said, "Well, I don't know that; right? If this expert has the experience and the foundation is laid for him to make that definitive conclusion, I'll allow it. Obviously, you can cross him on that conclusion."

We conclude that no error occurred in admitting the firearm expert's testimony, and therefore we have no need to address prejudice. Still, it is notable that the defense did not argue that the ballistics evidence should be excluded. The defense instead argued that the firearm expert should be limited to saying that the bullets from the two crimes were consistent with being fired from the same gun, i.e., the bullets used to kill Ahumada and those used to shoot at Quintanilla were *consistent with* having been fired from the same gun. Thus, the evidence—even using Elias's watered down formulation of it—still connected him to the gun used to murder Ahumada.

III.    Failure to instruct on voluntary manslaughter

Elias contends that the trial court erred in not sua sponte instructing the jury on voluntary manslaughter, heat of passion. We disagree that the trial court had a duty to instruct on that theory.

A trial court must instruct on all general principles of law relevant to the issues raised by the evidence, including lesser included offenses, even in the absence of a request. (*People v. Smith* (2013) 57 Cal.4th 232, 239.) Instruction on a lesser included offense is required when there is evidence the defendant is guilty of the lesser, but not the greater, offense. (*People v. Landry* (2016) 2 Cal.5th 52, 98.) This duty is not satisfied by instructing on only one theory if other theories are supported by the evidence. (*People v. Lee* (1999) 20 Cal.4th 47, 61.) Substantial evidence is that which a reasonable jury could find persuasive. (*People v. Williams* (2015) 61 Cal.4th 1244, 1263.) The existence of *any* evidence, no matter how weak, will not justify an instruction (*ibid.*), but the testimony of a single

15

witness, including the defendant, may suffice (*People v. Wyatt* (2012) 55 Cal.4th 694, 698).

We independently review whether the trial court erred by failing to instruct on a lesser included offense. (*People v. Nelson* (2016) 1 Cal.5th 513, 538.) In making this determination, we do not evaluate the credibility of the witnesses. (*People v. Wyatt*, *supra*, 55 Cal.4th at p. 698.) We view the evidence in the light most favorable to the defendant. (*People v. Millbrook* (2014) 222 Cal.App.4th 1122, 1137.)

Voluntary manslaughter is the intentional but nonmalicious killing of a human being, and is a lesser included offense of murder. (§ 192, subd. (a); *People v. Nelson*, *supra*, 1 Cal.5th at p. 538; *People v. Moye* (2009) 47 Cal.4th 537, 549.) A killing may be reduced from murder to voluntary manslaughter if it occurs upon a sudden quarrel or in the heat of passion on sufficient provocation, or if the defendant kills in the unreasonable but good faith belief that deadly force is necessary in self-defense. (*People v. Landry*, *supra*, 2 Cal.5th at p. 97; *Moye*, at p. 549.)

"The heat of passion sufficient to reduce murder to manslaughter 'exists only where "the killer's reason was actually obscured as the result of a strong passion aroused by a 'provocation' sufficient to cause an ' "ordinary [person] of average disposition . . . to act rashly or without due deliberation and reflection, and from this passion rather than from judgment." ' " ' " (*People v. Landry*, *supra*, 2 Cal.5th at p. 97.) Thus, heat of passion manslaughter has objective and subjective components. (*People v. Moye*, *supra*, 47 Cal.4th at p. 549; *People v. Enraca* (2012) 53 Cal.4th 735, 759.) The "provocation which incites the defendant to homicidal conduct in the heat of passion

16

must be caused by the victim [citation], or be conduct reasonably believed by the defendant to have been engaged in by the victim" (*People v. Lee*, *supra*, 20 Cal.4th at p. 59), and must have been sufficiently provocative to cause an ordinary person of average disposition to act rashly or without due deliberation and reflection, i.e., " 'from this passion rather than from judgment' " (*People v. Beltran* (2013) 56 Cal.4th 935, 939). To satisfy the subjective component, the defendant must have killed while under the *actual* influence of such a strong passion induced by legally adequate provocation. (*Moye*, at p. 550; *People v. Millbrook*, *supra*, 222 Cal.App.4th at p. 1139.) The passion aroused may be any violent, intense, high-wrought or enthusiastic emotion other than revenge. (*Millbrook*, at p. 1139.) Substantial evidence to support an instruction may exist even in the face of inconsistencies presented by the defense itself and when the defense fails to request the instruction based on trial tactics. (*In re Hampton* (2020) 48 Cal.App.5th 463, 480.)

To support his argument that there was sufficient evidence to give a voluntary manslaughter instruction, Elias first refers to Wendy's statements that he and Ahumada were romantically interested in her. Elias then cites Wendy's statement that once when she was at the view with Ahumada, he tried to force himself on her. From this, Elias posits that he shot Ahumada because he reasonably believed, rightly or wrongly, that Ahumada was forcing himself on Elias's "paramour."

Even if we assumed Ahumada made some kind of advance to Wendy that night, there is still no evidence of the objective and subjective components of voluntary manslaughter. That is, assuming Ahumada did something that could be perceived as inappropriate, what precisely did he do? Did he make an off-color

17

comment to Wendy, touch her, try to kiss her?  There is no evidence of what he specifically did that might have constituted legally adequate provocation such that it caused Elias to shoot him.  (See generally *People v. Beltran, supra*, 56 Cal.4th at p. 957.)  There was similarly no evidence Elias was actually influenced by such a strong passion caused by that provocation rather than from judgment.  (*Id.* at p. 939; see, e.g., *People v. Manriquez* (2005) 37 Cal.4th 547, 585 [no testimony that victim's insults enraged defendant].)  To the contrary, that Elias had a gun could undercut any argument he acted in a heat of passion: why bring a gun to a social event if you are just planning to hang out and look at the view?

IV.     Trial court's comments during voir dire

Elias contends that during voir dire the trial court improperly emphasized the importance of circumstantial evidence in a case where, as the prosecutor said in argument, circumstantial evidence was the star witness.  As we explain, our review of voir dire shows that the trial court did not make statements favoring the prosecution.[8]

A trial court must refrain from making comments before the jury suggesting it has allied itself with one side or the other. (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1320; see also *People v. Tatum* (2016) 4 Cal.App.5th 1125, 1130.)  In *Tatum*, for example, the trial court told prospective jurors during voir dire that they would judge witnesses' credibility and not to prejudge

---

[8]     The People argue that the defense did not object to the comments, thereby forfeiting the issue.  (See generally *People v. Monterroso* (2004) 34 Cal.4th 743, 781.)  We nonetheless address the issue on the merits.  (See generally § 1259.)

18

anybody.  The trial court then gave an example of prejudgment, saying that based on her horrible experiences with plumbers, she did not believe a plumber would tell the truth.  Such prejudgment, the trial court concluded, would be unfair.  The defense moved for a mistrial based on the trial court's comments because the defense alibi witness was a plumber.  (*Tatum*, at pp. 1128–1129.)  The trial court denied the motion, but the Court of Appeal held it should have been granted because the judge's comments bore on the credibility of a witness.  (*Id.* at p. 1131.)

Nothing remotely like what happened in *Tatum* occurred here.  The trial court here did not express bias in favor of circumstantial evidence.  Rather, our review of the entirety of voir dire shows the trial judge and counsel emphasized that direct and circumstantial evidence were equally valid.  The record shows that circumstantial evidence was first addressed during voir dire of the jury panel,[9] when the prosecutor gave examples of direct and circumstantial evidence.  After telling jurors they would be instructed that direct and circumstantial evidence are "the same" with neither being better than the other, the prosecutor gave another example of circumstantial evidence.  In the example, the prosecutor stops his car because cars in front of him have stopped.  However, the car behind the prosecutor fails to stop and hits him.  When questioned by CHP, the driver who hit the prosecutor said a third person hit her and pushed her into the prosecutor's car.  CHP sees no damage to the back of the car that hit the prosecutor, and so writes that person a ticket.

Later, the trial court returned to the topic of evidence, saying that although "everybody would want direct evidence

---

[9]     Members of the panel were seated and heard the challenged comments.

19

because, you know, if you have a situation where someone saw something happen, a lot of people may prefer that." The trial court then said, "But [the prosecutor] gave a great hypothetical regarding the car accident where circumstantial evidence . . . is also very valuable in proving some things happening." The trial court then asked a prospective juror if the juror would follow an instruction to evaluate direct and circumstantial evidence equally. The prospective juror agreed.

Elias argues that the trial court calling the prosecutor's hypothetical "great" "tipped the balance in favor of the prosecution's case." It did no such thing. In context, the trial court was clearly saying that the hypothetical was great, not that circumstantial evidence is so great that it can prove a suspect's guilt even if the evidence is weak. Indeed, the totality of the voir dire shows that the trial court, as well as counsel,[10] told the jury the exact opposite: that circumstantial and direct evidence are to be treated equally and that if the prosecution did not prove its case beyond a reasonable doubt based on circumstantial evidence, the jurors had to find the defendant not guilty.

Nor do we agree that the trial court "enhance[d] the value of the circumstantial evidence" during a colloquy with a prospective juror. During defense voir dire, a prospective juror commented that circumstantial evidence was imperfect and not "strong enough evidence." The trial court addressed the juror, saying that no "evidence is really ever perfect" and rarely is there video of the incident. The trial court then gave two hypotheticals,

---

[10] Defense counsel, for example, told jurors that direct and circumstantial evidence are both "acceptable" and that if there is a reasonable interpretation of the circumstantial evidence pointing to innocence, then the jury had to acquit.

one in which a juror believed that circumstantial evidence proved the case beyond a reasonable doubt and another in which the juror did not believe that. The trial court explained, "That's all we're asking everybody to do . . . whether it's direct evidence or circumstantial evidence, you have to listen to that and you have to decide whether that evidence is strong enough for you to believe beyond a reasonable doubt that these certain things are proven, right? [¶] And sometimes circumstantial evidence, you may think . . . that evidence is not strong enough. I don't believe that raises to proof beyond a reasonable doubt. Sometimes the circumstantial evidence, you'll feel like, you know what? That's enough for me. That—based on everything together, I think that is enough for me. Again, that's exactly what we're asking you to do."

By this, the trial court did not tell prospective jurors to elevate circumstantial evidence above direct evidence. Rather, to the extent the prospective juror was saying circumstantial evidence was insufficient to prove the elements of a crime beyond a reasonable doubt, the trial court properly disabused the prospective juror of that misunderstanding. The trial court thus ensured that prospective jurors correctly understood the law, that, as the jurors were later instructed, circumstantial and direct evidence are both acceptable types of evidence, with neither necessarily more reliable than the other, and with neither being entitled to greater weight than the other. (CALCRIM No. 223.) In short, nothing in the trial court's pretrial remarks misstated or diluted the burden of proof or was likely to confuse or mislead the jury as to the process for determining the case. (See *People v. Freeman* (1994) 8 Cal.4th 450, 503–505.)

Elias's attempt to analogize this case to *People v. Lyons* (1956) 47 Cal.2d 311 and *People v. Moore* (1954) 43 Cal.2d 517, thus fails. The defendant in *Lyons* was on trial for two counts of lewd conduct on two young girls. The trial court gave a standard cautionary instruction stating that jurors were required to examine the prosecuting witnesses' testimony with caution. (*Lyons*, at p. 320.) But the trial court modified the instruction, adding in its own handwriting: " 'and the fact that the charge here made is one difficult to disprove should not deter you from rendering a verdict of guilty, if you are convinced beyond a reasonable doubt that the defendant is guilty.' " (*Ibid*.) In the Court of Appeal's view, although the addition was not a misstatement of law, it unnecessarily emphasized a point already made—that viewing the victim's testimony with caution was not a bar to a finding of guilt—and therefore could suggest that the trial court was inclined to believe the defendant was guilty. (*Id*. at pp. 322–323.)

Similarly, in *People v. Moore*, *supra*, 43 Cal.2d at pages 526 to 527, the trial court gave two instructions on self-defense that, although not misstatements of law, were stated from the prosecution's viewpoint instead of impartially as between the People and the defendant. In the absence of an instruction stating the law of self-defense from the defendant's viewpoint, an impression could have been created in the jury's mind that the judge believed that self-defense had not been established. (*Id*. at p. 527.)

*Lyons* and *Moore* are distinguishable because they concern jury instructions and not comments made during voir dire. The comments here did not amount to instruction. (See *People v. Seumanu*, *supra*, 61 Cal.4th at p. 1357 [challenge to trial court's

comments during voir dire is claimed judicial error, not instructional error].) In any event and as we have said, the trial court's comments were proper. They did not misstate the law or suggest that the trial court believed circumstantial evidence was somehow more worthy than direct evidence.

For the same reasons, we reject Elias's contention that the trial court's statements rendered his trial fundamentally unfair. (See generally *Partida, supra*, 37 Cal.4th at p. 439.)

V.      Trial court's comment about reasonable doubt

In a related argument, Elias contends that during voir dire the trial court urged jurors to make decisions based on their hearts rather than on an analysis of the evidence. We discern no prejudicial error.

A well-settled rule is that it is improper to tell jurors that emotion may reign over reason and a critical and neutral evaluation of the evidence. (*People v. Holmes, McClain and Newborn* (2022) 12 Cal.5th 719, 788–789; *People v. Covarrubias* (2016) 1 Cal.5th 838, 894.) Elias argues that the trial court twice violated this rule, first when telling a prospective juror, "Let's say, that there's only circumstantial evidence in this case, but the detectives piece together all their evidence so well that in your mind you believe that based on everything that you've heard, because, you know, the witness testimony was consistent with the physical evidence, again, they pieced together everything. So in your mind, you felt that the prosecutor proved its case beyond a reasonable doubt based on circumstantial evidence. [¶] Could you vote guilty in that situation *if you in your heart* believed that they proved their case beyond a reasonable doubt?" (Italics added.)

The trial court asked a second prospective juror if the juror could vote not guilty if the juror believed that the prosecutor had not proven the elements of the crime beyond a reasonable doubt, even if the prosecution called 200 witnesses. The trial court then asked, "Let's say, the prosecutor called one witness. But based on that one witness's testimony, *you feel in your heart* that based on that one witness's testimony and the evidence presented, it was enough to prove beyond a reasonable doubt that the defendant is guilty. [¶] In that situation, you would have to vote guilty, could you do that?" (Italics added.)

We do not agree that the trial court's comments can reasonably be interpreted as urging jurors to base any decision on a vague emotion, i.e., their "heart," as opposed to a critical and neutral evaluation of the evidence. Indeed, in the first comment, the trial court referred to making decisions based on *evidence*— witness testimony and physical evidence—that created in the juror's "mind" proof beyond a reasonable doubt. And in the second comment, the trial court again referred to evidence— witness testimony and other evidence—that was not enough to prove beyond a reasonable doubt the elements of the crime. In both instances, the trial court linked "heart" to the reasonable doubt standard; that is, jurors had to believe in their hearts that the elements of the crime were proven beyond a reasonable doubt.

In a similar case, the prosecutor argued to the jurors that if they " 'have that feeling, that conviction, that gut feeling that says yes, this man is guilty, he's guilty of these crimes . . . beyond a reasonable doubt.' " (*People v. Barnett* (1998) 17 Cal.4th 1044, 1156.) The defendant argued that telling jurors guilt could be based on a "gut feeling" would have led them to think they could

24

convict him on a standard of proof lower than reasonable doubt. (*Ibid.*) The court rejected that argument, saying that the prosecutor was merely telling jurors to trust their gut feelings in assessing witness credibility and conflicts in the testimony. (*Id.* at p. 1157.) Moreover, the prosecutor otherwise told jurors to examine the evidence.

The cases Elias cites do not otherwise persuade us that the comments here were erroneous. In *United States v. Hernandez* (3rd Cir. 1999) 176 F.3d 719, 729, the trial court told jurors that there was no specific definition of reasonable doubt, rather, "It's what you in your own heart and your own soul and your own spirit and your own judgment determine is proof beyond a reasonable doubt." (Italics omitted.) In *State v. McMillan* (2010) 44 Kan.App.2d 913, 920, the prosecutor said what reasonable doubt comes down to is "if you, in your hearts and in your minds, after hearing all the evidence and taking all the evidence into consideration, you feel in your hearts and in your minds that the State had proven each and every element of the crime charged, you have reached that reasonable doubt standard and you must find the defendant guilty." The appellate courts in both cases found the comments to be error.

The comments in *United States v. Hernandez* completely divorced the concept of "heart" from the reasonable doubt standard, saying that there was no definition of reasonable doubt so instead the jurors should follow their hearts. In contrast, the trial court here linked the two, saying jurors had to believe in their hearts that the crime had been proven beyond a reasonable doubt. As for *State v. McMillan*, we are not inclined to agree with its finding that the comments were error, and, in any event, we are not bound by this non-California authority. (*People v. Troyer*

25

(2011) 51 Cal.4th 599, 610 [California courts not bound by out-of-state authorities]; *People v. Williams* (2013) 56 Cal.4th 630, 668 [federal appellate decisions not binding on California courts].)[11]

In any event, any misstatement by the trial court did not prejudice Elias, because the jury was properly instructed and both counsel properly stated the reasonable doubt standard in their arguments. As to the instructions, the trial court gave the standard reasonable doubt instruction, CALCRIM No. 220, which directed that proof "beyond a reasonable doubt is proof that leaves you with an abiding conviction that the charge is true. The evidence need not eliminate all possible doubt because everything in life is open to some possible or imaginary doubt. In deciding whether the People have proved their case beyond a reasonable doubt, you must impartially compare and consider all the evidence that was received throughout the entire trial. Unless the evidence proves the defendant guilty beyond a reasonable doubt, he is entitled to an acquittal and you must find him not guilty." The trial court also instructed the jury to follow the law as instructed (CALCRIM No. 200) and not to take anything the trial court "said or did during the trial as an indication of what I think about the evidence, the witnesses, or what your verdict should be" (CALCRIM No. 3530). We presume that the jury followed the instructions given. (*People v. Silveria and Travis* (2020) 10 Cal.5th 195, 271–272.)

As to what counsel said, the prosecutor in closing argument read a part of CALCRIM No. 220 to the jury, that jurors had to have an abiding conviction the charge is true. The prosecutor

---

[11]    We also note that the court found the error did not prejudice the defendant. (*State v. McMillan, supra*, 44 Kan.App.2d at pp. 923–924.)

26

added that jurors had to be "convinced" they "made the right call. There was a lot of evidence that it was him." The prosecutor told the jury that 100 percent was not required, but it had to be convinced beyond a reasonable doubt. That is, "you're convinced beyond a reasonable doubt . . . [if] the evidence you heard that fits all the facts that you heard is that he's guilty. The only reasonable explanation that fits all the evidence." Defense counsel similarly told jurors that reasonable doubt meant there was only one reasonable way to interpret the evidence. The law requires jurors to have "a lasting, abiding conviction that the charge is true, and that there's no reasonable explanation for the evidence that points to innocence."

Given the instructions and the argument, it not reasonably likely that any misstatement during voir dire caused a juror to convict Elias on a standard lower than reasonable doubt. (See, e.g., *People v. Barnett*, *supra*, 17 Cal.4th at p. 1157 [likelihood prosecutor's comment caused misunderstanding mitigated by trial court's admonishments to follow the law and instructions given by the court]; see generally *People v. Johnsen* (2021) 10 Cal.5th 1116, 1167.) Nor did the trial court's statement amount to a federal constitutional violation that deprived Elias of his right to a fair trial. (See generally *People v. Partida*, *supra*, 37 Cal.4th at p. 439.)

VI.    Instruction on testimony of single witness

Elias contends that the trial court erred by instructing the jury with CALCRIM No. 301, which provided that the "testimony of only one witness can prove any fact. Before you conclude that the testimony of one witness proves a fact, you should carefully review all the evidence." In support, Elias cites *State v. Dever* (2022) 2022 UT App. 35, 508 P.3d 158, *161, *170, which held

27

that giving a similar instruction in a child sexual abuse case was prejudicial error because the instruction suggested that the complaining witness's testimony carried more weight than other testimony and evidence.  But we are not bound by out-of-state authority.  (*People v. Troyer*, *supra*, 51 Cal.4th at p. 599.)

Instead, we are bound by decisions of our California Supreme Court.  (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 454.)  Our Supreme Court has held that where corroboration is not required, a trial court may instruct the jury with CALCRIM No. 301, and that giving it does not violate a defendant's constitutional rights.  (*People v. Rincon-Pineda* (1975) 14 Cal.3d 864, 884–885; *People v. Tran* (2022) 13 Cal.5th 1169, 1201; *People v. Turner* (1990) 50 Cal.3d 668, 696.)

VII.  Cumulative error and prejudice

Elias asserts that the cumulative effect of the purported errors requires reversal, even if they were individually harmless.  Because we have found no prejudicial error, "there is no cumulative prejudice to address."  (*People v. Landry*, *supra*, 2 Cal.5th at p. 101.)

VIII.  Motion to dismiss the firearm enhancement

At sentencing, the trial court refused Elias's request to strike the 25-year firearm enhancement (§ 12022.53, subd. (d)) after finding that he posed a threat to public safety.  Elias now raises two issues as to the imposition of that enhancement.  First, under recent amendments to section 1385, the trial court was obligated to strike the enhancement.  Second, even if the trial court retained discretion to impose the enhancement, it abused its discretion in doing so.  We disagree with both contentions.

28

### A. *Statutory interpretation*

Before 2018, trial courts had to impose a section 12022.53 enhancement. (*People v. Tirado* (2022) 12 Cal.5th 688, 695.) The Legislature then enacted Senate Bill No. 620 to give trial courts discretion to strike the enhancement in the interest of justice. (*Tirado*, at pp. 695–696; § 12022.53, subd. (h).) Thereafter, the Legislature in 2021 enacted Senate Bill No. 81 (2021–2022 Reg. Sess.) (Stats. 2021, ch. 721, § 1), which amended section 1385 "to specify factors that the trial court must consider when deciding whether to strike enhancements from a defendant's sentence in the interest of justice." (*People v. Sek* (2022) 74 Cal.App.5th 657, 674; *People v. Walker* (2022) 86 Cal.App.5th 386, 395, review granted Mar. 22, 2023, S278309 [Sen. Bill No. 81 fine tunes how a court exercises sentencing discretion] (*Walker*).) The amended statute applies to sentences imposed on or after January 1, 2022, and accordingly applies to Elias's sentence.

As amended, section 1385, subdivision (c), now provides in relevant part:

"(1) Notwithstanding any other law, the court shall dismiss an enhancement if it is in the furtherance of justice to do so, except if dismissal of that enhancement is prohibited by any initiative statute.

"(2) In exercising its discretion under this subdivision, the court shall consider and afford great weight to evidence offered by the defendant to prove that any of the mitigating circumstances in subparagraphs (A) to (I) are present. Proof of the presence of one or more of these circumstances weighs greatly in favor of dismissing the enhancement, unless the court finds that dismissal of the enhancement would endanger public safety. 'Endanger public safety' means there is a likelihood that the

29

dismissal of the enhancement would result in physical injury or other serious danger to others.  [¶]

"(A) Application of the enhancement would result in a discriminatory racial impact as described in paragraph (4) of subdivision (a) of Section 745.

"(B) Multiple enhancements are alleged in a single case.  In this instance, all enhancements beyond a single enhancement shall be dismissed.

"(C) The application of an enhancement could result in a sentence of over 20 years.  *In this instance, the enhancement shall be dismissed.*

"(D) The current offense is connected to mental illness.

"(E) The current offense is connected to prior victimization or childhood trauma.

"(F) The current offense is not a violent felony as defined in subdivision (c) of Section 667.5.

"(G) The defendant was a juvenile when they committed the current offense or any prior offenses, including criminal convictions and juvenile adjudications, that trigger the enhancement or enhancements applied in the current case.

"(H) The enhancement is based on a prior conviction that is over five years old.

"(I) Though a firearm was used in the current offense, it was inoperable or unloaded."  (§ 1385, subd. (c)(1)–(2), italics added.)

Elias interprets the emphasized sentence in section 1385, subdivision (c)(2)(C), as *requiring* trial courts to strike any enhancement resulting in a sentence greater than 20 years, without regard to public safety.  Accordingly, because imposing the firearm enhancement here would increase his sentence from

15 years to life to 40 years to life, the trial court should have stricken the enhancement.  The People counter that reading the statute as a whole shows that trial courts shall strike an enhancement if one of the mitigating circumstances specified in subparagraphs (A) to (I) are present *unless* the trial court finds that doing so would endanger public safety.  Accordingly, the trial court acted within its discretion to impose the enhancement because the trial court found that Elias posed a danger to public safety.

In a case such as this involving statutory interpretation, our fundamental task is to determine the Legislature's intent so as to effectuate the law's purpose, beginning with an examination of the statute's words and giving them a plain, commonsense meaning.  (*People v. Gonzalez* (2017) 2 Cal.5th 1138, 1141; *Laurel Owner's Assn., Inc. v. Appellate Division of Superior Court* (2018) 28 Cal.App.5th 1146, 1151.)  We consider the entire scheme's language and related statutes, harmonizing terms when possible.  (*Gonzalez*, at p. 1141.)  If unambiguous, the plain meaning of the statutory language controls, and we need go no further.  (*Laurel*, at p. 1151.)  But if language is subject to more than one reasonable construction, we may consider extrinsic aids, including legislative history.  (*People v. Sinohui* (2002) 28 Cal.4th 205, 211.)  Ultimately, we choose the construction comporting most closely with the legislators' apparent intent, with a view to promoting the statute's general purpose, rather than defeating it.  (*Gonzalez*, at p. 1141.)  We review questions of statutory interpretation de novo.  (*Ibid.*)

On its face and reading it as a whole, section 1385 does not mandate that trial courts dismiss enhancements if imposing them would lead to a sentence of over 20 years.  (See, e.g., *People*

31

*v. Mendoza* (2023) 88 Cal.App.5th 287; *People v. Anderson* (2023) 88 Cal.App.5th 233, review granted Apr. 19, 2023, S278786; *People v. Lipscomb* (2022) 87 Cal.App.5th 9 (*Lipscomb*)*;* see also *Walker*, *supra*, 86 Cal.App.5th at p. 396, rev.gr.)  To be sure, a superficial read of "shall" in subdivision (c)(2)(C) implicates a mandatory obligation, not a permissive one.  However, we do not read words or phrases in isolation but must consider how they fit in the context of the statute as a whole.  (*Walker*, at p. 396.)  Subdivision (c)(1) sets the statute's overall context, that dismissing an enhancement must further justice, a notion that implicates discretion.  (See *Walker*, at p. 395 [dismissing enhancement in furtherance of justice is discretionary call].)  Subdivision (c)(2) then expressly refers to a trial court's exercise of discretion, but directs that its exercise requires consideration of nine mitigating circumstances.  If a mitigating circumstance exists, then the trial court shall afford it great weight and dismiss the enhancement unless doing so would endanger public safety.  (§ 1385, subd. (c)(2).)  "This language, taken together, explicitly and unambiguously establishes:  the trial court has discretion to dismiss sentencing enhancements; certain circumstances weigh greatly in favor of dismissal; and a finding of danger to public safety can overcome the circumstances in favor of dismissal."  (*Anderson*, at p. 239.)  In short, the exception for public safety applies to *all* mitigating circumstances in subparagraphs (A) through (I).  "The 'shall be dismissed' language in section 1385(c)(2)(C), like the language of all of the listed mitigating circumstances, applies only if the court does *not* find that dismissal of the enhancement would endanger public safety."  (*Mendoza*, at p. 296.)

32

*Walker*, *supra*, 86 Cal.App.5th 386, review granted, rejected interpreting the similar provision in section 1385, subdivision (c)(2)(B), to deprive trial courts of discretion to impose an enhancement. That subdivision refers to multiple enhancements alleged in a single case, in which "instance, all enhancements beyond a single enhancement shall be dismissed." (§ 1385, subd. (c)(2)(B).) *Walker*, at page 396, held that the text and purpose of section 1385 and Senate Bill No. 81 and the rules of statutory construction showed that trial courts are not obligated to dismiss all but one enhancement whenever a jury finds multiple enhancements true. The court said, "If we were to read the phrase appended to the multiple enhancements mitigating factor as *automatically* mandating dismissal of all but one enhancement whenever multiple enhancements exist, then the existence of multiple enhancements would not 'weigh greatly' in favor of dismissal—it would weigh *dispositively*. But that is not what the statute says, and we are not allowed to rewrite the statute." (*Walker*, at p. 397; accord *People v. Anderson*, *supra*, 88 Cal.App.5th at p. 240, rev.gr. ["dismissal *shall* occur but only *if,* in exercising its discretion and giving great weight to certain factors, the court finds dismissal is in the interests of justice or would not endanger public safety"].)

Moreover, construing the statute as Elias suggests would lead to absurd results. In all cases in which a 20-year or 25-year-to-life enhancement under section 12022.53, subdivisions (c) and (d), respectively, has been found true, courts would have to dismiss the enhancement because imposing it would result in a sentence of over 20 years in all cases. (*People v. Mendoza*, *supra*, 88 Cal.App.5th at p. 296; *Lipscomb*, *supra*, 87 Cal.App.5th at pp. 20–21.) Were this the Legislature's intent, then it would

33

have, for example, repealed or somehow addressed subdivisions (c) and (d) of section 12022.53, but it did not do so. Thus, our construction is the one that does not render section 12022.53 subdivisions (c) and (d), surplusage or meaningless in the statutory framework.

Also, as *Walker*, *supra*, 86 Cal.App.5th at page 398, review granted, pointed out, if our Legislature wanted to remove sentencing discretion in certain instances, then there were direct ways to achieve that purpose. Using the example of multiple enhancements (§ 1385, subd. (c)(2)(B)), the Legislature could have had a "standalone section that says: 'If there's more than one enhancement, automatically dismiss all but one'" instead of "opt[ing] to embed that mandate as an addendum to one of nine mitigating factors to be given great weight in the context of a trial court's discretionary decision whether to dismiss. In other words, if our Legislature was trying to implement a rule of mandatory and automatic dismissal, it picked a very circuitous way to do so." (*Walker*, at p. 398.)

Legislative history supports our interpretation. A Senate Floor Analysis dated September 8, 2021, noted that, according to the bill's author, there was a lack of clarity and guidance as to how judges were to exercise their discretion regarding enhancements. (Sen. Rules Com., Off. Of Sen. Floor Analyses, Unfinished Business Analysis of Sen Bill No. 81 (2021–2022 Reg. Sess.) as amended Aug. 30, 2021, p. 5.) Senate Bill No. 81 therefore aimed "to provide clear guidance on how and when judges may dismiss sentencing enhancements and other allegations that would lengthen a defendant's sentence. By clarifying the parameters a judge must follow, [Senate Bill No.] 81 codifies a recommendation developed with the input of the

judges who serve on the Committee on the Revision of the Penal Code for the purpose of improving fairness in sentencing *while retaining a judge's authority to apply an enhancement to protect public safety*."  (*Ibid.*; italics added.)

Otherwise, our review of the statute's legislative history shows that at no time was it stated or considered that an enhancement shall be dismissed in all cases where the sentence would exceed 20 years, without consideration of public safety. *Lipscomb*, *supra*, 87 Cal.App.5th at page 19, thus observed in its review of the legislative history that the versions of Senate Bill No. 81 "confirm the Legislature's intent that the trial court retain the ability to Impose an enhancement where failure to do so would endanger public safety."  The February 8, 2021 version "provided that 'the court shall dismiss an enhancement upon finding any of the following circumstances to be true,' and, after listing the mitigating circumstances in paragraph (1), further provided that '[t]he court may decline to dismiss a charged sentencing enhancement pursuant to paragraph (1) upon a showing by clear and convincing evidence that dismissal of an enhancement would endanger public safety."  (*Ibid.*)  A later iteration of the bill "provided that '[t]here shall be a presumption that it is in the furtherance of justice to dismiss an enhancement upon a finding that any of the mitigating circumstances in subparagraphs (A) to (I), inclusive, are true.  This presumption shall be overcome by a showing of clear and convincing evidence that dismissal of the enhancement would endanger public safety.' "  (*Lipscomb*, *supra*, 87 Cal.App.5th at p. 19; see also Assem. Com. on Public Safety, As Proposed to be Amended in Committee (2021–2022 Reg. Sess.) as amended Apr. 27, 2021, p. 4 [recommending "guidelines and presumptions (*but not*

*requirements*)" be established that judges should consider dismissing enhancement in furtherance of justice based on mitigating circumstances], italics in original.) "Thus every version of the statute—including, as we conclude, the current one—expressly empowered the court to impose the enhancement upon a finding that dismissing it would endanger public safety." (*Lipscomb*, at p. 19.)

And, as our task is to ascertain the Legislature's intent as a whole in adopting the legislation, we generally do not consider statements of an individual legislator or a bill's author in construing a statute in the absence of a showing the statement was part of the debate in the Legislature and considered by it. (*Quintano v. Mercury Casualty Co.* (1995) 11 Cal.4th 1049, 1062; *People v. Garcia* (2002) 28 Cal.4th 1166, 1175–1176, fn. 5.) It is nonetheless noteworthy that Senate Bill No. 81's author, Senator Nancy Skinner, intended judges to retain discretion to impose an enhancement. After the bill had been approved, she wrote to clarify her intent regarding two provisions of the bill. She wrote that the August 30, 2021 amendments removed "the presumption that a judge must rule to dismiss a sentence enhancement if certain circumstances are present, and instead replaces that presumption with a 'great weight' standard where these circumstances are present. The retention of the word 'shall' in Penal Code § 1385(c)(3)(B) and (C) should not be read as a retention of the previous presumption language—the judge's discretion is preserved in Penal Code § 1385(c)(2)." (Sen. Skinner, author of Sen. Bill No. 81 (2021–2022 Reg. Sess.), letter to Sect. of the Sen., Sept. 10, 2021, 121 Sen. J. (2021–2022 Reg. Sess.) p. 2638.) Further, she clarified that in establishing the great weight standard to impose or to dismiss an enhancement,

she intended that the standard be consistent with California Supreme Court case law. "In short, the bill's author expressly indicated the intent that the judge's discretion to decide whether to impose the enhancement be preserved notwithstanding the 'shall be dismissed' language in section 1385, subdivision (c)(2)(C)." (*Lipscomb, supra*, 87 Cal.App.5th at p. 20.)

Finally, we do not agree with Elias that *People v. Sek* supports his interpretation of section 1385, subdivision (c)(2)(C). *Sek, supra*, 74 Cal.App.5th at pages 664 to 670, first addressed other recent enactments, finding that they were retroactive, so the defendant was entitled to remand for resentencing. The court also briefly noted that Senate Bill No. 81 had been enacted during the pendency of the appeal, citing subdivision (c)(2)(C), because Sek's sentence with a firearm enhancement exceeded 20 years. The court therefore noted that on remand the trial court had to apply the new law. (*Sek*, at p. 674.) *Sek* did not say how the new law should be applied or otherwise analyze that law.

B.     *The trial court did not abuse its discretion*

Elias alternatively argues that even if section 1385, subdivision (c)(2)(C), did not mandate dismissing the firearm enhancement, the trial court abused its discretion in not doing so. We disagree.

A trial court's discretionary decision whether to strike an enhancement may not be reversed on appeal unless the appellant shows it is irrational or arbitrary. (*People v. Carmony* (2004) 33 Cal.4th 367, 375.) Absent such a showing, we presume that the trial court acted to achieve legitimate sentencing objectives, and we will not set aside a decision merely because reasonable people might disagree. (*Id.* at p. 378.) A trial court thus does not abuse

37

its discretion unless its decision is so irrational and arbitrary that no reasonable person could agree with it. (*Ibid.*)

Here, the trial court said it had considered the general objectives of sentencing, including protecting society. The trial court further noted that there was evidence that Elias had previously shot at a person (Quintanilla) and that there was no evidence he committed the current crime because of provocation or duress. Rather, "It appears this defendant shot and killed Jose Ahumada for really no reason," and "the circumstances in this case demonstrate how dangerous this defendant is." The trial court thus described this case as one of the most disturbing it had seen and found that dismissing the enhancement would result in "extreme danger to public safety and danger to others."

On appeal, Elias faults the trial court's finding that he was a danger to public safety. He describes the evidence he was the killer as "exceptionally weak" and insufficient to show he had an intent to kill. However, the jury clearly did not find the evidence to be exceptionally weak. Also, the trial court was entitled to rely on evidence that just weeks before Ahumada's murder, Elias was involved in another shooting to support its conclusion he posed a danger to the public.

Elias also faults the trial court for stating that there was no reason for the murder and repeats his argument that Wendy was not credible and there must have been a motive for the shooting even though the record didn't reveal one. Again, the trial court did not misstate the evidence and was not required to speculate as to any motive Elias might have had for murder.

Elias also makes too much of the trial court's observation that there "is no crime more serious than murder" by arguing that it reflects the trial court's misunderstanding of the issue. He

thus points out that punishment for the second degree murder was not the issue. The issue was whether to dismiss the firearm enhancement. However, in context, the trial court first said it had considered the nature and seriousness of the crime, and it then observed that in the universe of crimes, murder is the most serious. Therefore, the suggestion that the trial court misunderstood the issue or that its statement about murder reflects an abuse of discretion is meritless.

Next, Elias's counsel asked the trial court to dismiss the firearm enhancement based on his age when he committed the offense. Although a defendant's juvenile status is a mitigating circumstance (§ 1385, subd. (c)(2)(G)), Elias was 18 years old when he committed the murder and therefore not a juvenile. Although the trial court had the discretion to nonetheless consider his youth (see § 1385, subd. (c)(4) [listed circumstances are not exclusive]), the trial court here found that it was an insufficient mitigating circumstance when weighed against the danger Elias posed to the public.

Finally, Elias's counsel referred to Elias's substance abuse, addiction, and addictive disorders. However, other than vaguely referring to those conditions, counsel produced no evidence or further explanation of them, stating he would do so at a subsequent hearing to introduce materials relevant to a future parole hearing. (See generally *People v. Franklin* (2016) 63 Cal.4th 261.) Thus, other than counsel's bare statement, the trial court had nothing before it to establish this mitigating circumstance.

## DISPOSITION

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EDMON, P. J.

We concur:

LAVIN, J.

EGERTON, J.